**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **MERIDIAN LABORATORIES, INC.,** | ) | |
| | ) | |
| | ) | **No. 18 CV 6007** |
| **Plaintiff,** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **ONCOGENERIX USA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Meridian Laboratories, Inc. ("Meridian") has filed a six-count amended complaint against defendant OncoGenerix USA, Inc. ("OncoGenerix") alleging, *inter alia*, that it breached a Service Provider Agreement under which OncoGenerix was to undertake process development and testing of Meridian's proprietary formulation of a pharmaceutical cancer treatment product known as ML 141. (Dkt. 35.) Meridian seeks damages and injunctive relief. OncoGenerix has filed a counterclaim alleging that Meridian breached that same Service Provider Agreement and seeking damages. (Dkt. 15.)

Discovery in this matter is ongoing. A dispute has arisen as to whether documents responsive to Meridian's requests for production but are physically possessed by a non-party Chinese limited liability company known as Mudanjiang Onco Generix Co. Ltd. ("OncoMDG") are within the "control" of OncoGenerix under the meaning of Federal Rule of Civil Procedure 34. At a hearing on July 9, 2019, the Court directed the parties to submit position papers on the discovery dispute. (Dkt. 43.) By its August 6, 2019 Order, the Court directed OncoGenerix to fully respond to certain relevant interrogatories and requests for admission. (Dkt. 49.) The

Court has reviewed the parties' submissions, OncoGenerix's responses to Meridian's initial and supplemental discovery requests, and heard argument from counsel at several hearings. For the reasons set forth below, the Court finds that documents possessed by OncoMDG are within "control" of OncoGenerix under the meaning of Rule 34 and it rejects OncoGenerix's additional objections to producing the documents in question. Accordingly, OncoGenerix shall fully respond to any outstanding requests for production in accordance with this Opinion by October 18, 2019.

## I.    FACTUAL BACKGROUND

The facts set forth below are drawn from the parties' pleadings and discovery responses, the parties' July 24, 2019 submissions, and the statements during in-court hearings on this matter.

### A.    The Companies Involved in the Underlying Transaction

#### 1.    Meridian Laboratories, Inc.

Meridian Laboratories is an Illinois corporation that has developed a proprietary formulation known as ML 141 for delivering the cancer treating compound docetaxel. (Dkt. 35-1 at 2-3.) According to Meridian, ML 141 is free of ingredients known to cause serious side effects and patients are able to tolerate ML 141 better than other currently available treatments. (*Id*. at 3.) Consequently, patients taking ML 141 are able to receive higher doses and they have improved outcomes in treating their cancers. (*Id.*)

#### 2.    OncoGenerix USA, Inc.

OncoGenerix is a California corporation. (Dkt. 15 at 10.) Igor Ivanov owned OncoGenerix until January 1, 2019 and was thus the corporation's owner the entirety of the business relationship between Meridian and OncoGenerix and during the occurrence of all events

that are material to this lawsuit. (OncoGenerix's Submission at 1.) On January 1, 2019, Marina Ivanova (Igor Ivanov's wife) became OncoGenerix's owner. (*Id*.) Ms. Ivanova also serves as OncoGenerix's sole Director, Chief Financial Officer, and Secretary. (OncoGenerix's Supp. Resp. to Int. No. 2.) Dmitry Itkin serves as OncoGenerix's CEO and President. (OncoGenerix's Supp. Resp. to Int. No. 2.) Dr. Roland Franke serves as OncoGenerix's Chief Scientific Officer and V.P. of Business Development. (OncoGenerix's Resp. To First Set of Int. No. 1; https://www.oncogenerixusa.com/about-us (last visited September 10, 2019).) OncoGenerix has only one other employee (Zhenya Bryksin). (OncoGenerix's Supp. Resp. to Int. No. 2.)

By its own description, OncoGenerix was set up with one purpose: namely, "to be a sales representative of services offered by a plant located in Mudanjiang, China owned by OncoMDG." (OncoGenerix's Submission at 2.) OncoGenerix "markets and sells" OncoMDG's services and makes a profit on the services it sells. (Dkt. 15 at 10; OncoGenerix's Submission at 3.) OncoGenerix maintains a website, available at www.oncogenerixusa.com, the terms and conditions of which previously identified the "owner of the website" as Mudanjiang Onco Generix Co. Ltd. (that is, OncoMDG.)[1]

### 3. Mudanjiang Onco Generix Co. Ltd.

OncoMDG is a Chinese limited liability company that is a contract manufacturer of "final formulation drugs" at a facility in Mudanjiang, China. (Dkt. 15 at 10*; see also* https://www.oncogenerix.com (last visited September 10, 2019).) OncoMDG is owned by Onco

---

[1] OncoGenerix has since changed this information, stating that it was a "mistake by the web developer." (OncoGenerix's Supp. Resp. to Req. to Admit No. 39.) Notably, OncoGenerix and OncoMDG share the same web developer. (August 27, 2019 Transcript ("Tr.") at 18-19.)

Generix China Ltd. (OncoGenerix's Submission at 1.)[2] OncoMDG states on its website that

Igor Ivanov is "the Chairman of the Board, investor, and founder of OncoGenerix [*i.e.,*

Mudanjiang Onco Generix Co. Ltd.]."[3] (*See* www.oncogenerix.com/about-us (last visited

September 10, 2019).) Maxim Ivanov (Igor and Marina's son), Dr. Roland Franke, Dmitry Itkin,

and Glinkovskaya Yulia also serve as OncoMDG's directors. (OncoGenerix's Supp. Resp. to

Int. No. 3; Tr. at 14.) Austin McDonald (General Manager/CEO), Erick Palacios (Director of

Operations), and Edwin Rodriguez (Director of Quality Operations) serve as officers for

OncoMDG. (OncoGenerix's Supp. Resp. to Int. No. 3.) OncoGenerix identified almost 200

additional employees of OncoMDG including, Zhao Long, Zhen Li, Chenxi Guo, and Bill Allen.

(*Id*.)

### B.    The Service Provider Agreement

On August 16, 2016, OncoGenerix submitted a proposal to Meridian for the "GMP

Process Development & Manufacturing Services for ML 141 Docetaxel Injection" (the

"Proposal"). (Dkt. 15 at 11.) In short, OncoGenerix proposed to "undertake the necessary work

to support a 505(b)(2) application to the US FDA" for ML 141 and "once approval is obtained to

manufacture the product on behalf of [Meridian] for the US market." (*Id*.) The Proposal was

prepared by OncoMDG employees McDonald, Long, and Rodriguez, each of whom were listed

with an OncoMDG e-mail address ("@oncogenerixmdg.com") and a Chinese phone number.

(OncoGenerix's Supp. Resp. to Int. No. 3; Meridian's Submission at Ex. 1.) The Proposal also

---

[2] Although OncoGenerix does not identify the owner/owners of Onco Generix China Ltd., it does assert that neither Marina Ivanova nor Igor Ivanov have any ownership interest in the latter company. (OncoGenerix's Submission at 1-2.)

[3] The "terms and conditions" page of OncoMDG's website makes it clear that "OncoGenerix" "refers to Mudanjiang Onco Generix Co. Ltd." (*see* www.oncogenerix.com/website-terms-and-conditions (last visited September 10, 2019).)

identified a project team to "undertake the scope of the work," which included OncoMDG officers Rodriguez and Palacios and OncoMDG employees Long, Li, Guo, and Allen, among others. (Meridian's Submission at Ex. 1.)

On September 26, 2016, Meridian and OncoGenerix memorialized the terms of their agreement regarding ML 141 in a Service Provider Agreement (the "Agreement"). The Agreement was executed by Meridian and OncoGenerix only; OncoMDG did not sign the agreement. (Tr. at 18.) Under the terms of the Agreement, Meridian agreed to pay OncoGenerix a total purchase price of $1,275,000, to be paid in five installments upon the completion of various milestones. (Dkt. 15 at 12.) At the August 27, 2019 hearing in this matter, the Court asked counsel for OncoGenerix how the $1,275,000 purchase price under the Agreement would be split between OncoGenerix and OncoMDG. Counsel for OncoGenerix stated that although he was not "100 percent positive," he "believ[ed]" OncoGenerix would recover a ten percent commission ($127,500) under the Agreement and the remainder would go to OncoMDG. (Tr. at 11-12.) As gleaned from the few sections of the Proposal and Agreement provided to the Court, there is no dispute that the actual development, testing, and manufacturing of ML 141 was planned to take place at OncoMDG's facility in China.[4]

### C. The Parties' Legal Claims

In its first amended complaint, Meridian alleges that Meridian and OncoGenerix entered into the Agreement on September 26, 2016 under which OncoGenerix agreed to undertake process development, stability filling, and stability testing of ML 141. (Dkt. 35-1 at 3.) In early

---

[4] Despite representations in their pleadings they would do so upon entry of a confidentiality order, the parties have not yet filed the full Proposal or Agreement. The Court notes that Meridian attempted to file the Agreement by filing a motion to seal before Judge Alonso. (Dkt. 37.) But Meridian has yet to abide by Judge Alonso's April 15, 2019 Order to provisionally file the Agreement under seal to permit the court to rule on the motion. (Dkt. 39.)

2017, Meridian entered into a separate contract with a large international manufacturer and distributer of pharmaceuticals wherein Meridian granted an exclusive license to the distributer to market ML 141 in the United States and Canada. (*Id.* at 3-4.) Under its contract with the distributor, Meridian was entitled to milestone payments of more than $10,000,000, the majority of which was directly dependent upon the timely performance of OncoGenerix in testing and manufacturing sufficient quantities of ML 141. (*Id.* at 4.) Meridian alleges that OncoGenerix breached the Agreement by failing to perform the testing and manufacturing of ML 141 in the agreed upon timeframe thereby causing Meridian to miss payments from the distributor. (*Id.* at 5.) Meridian – which terminated the Agreement on September 15, 2017 – further alleges that OncoGenerix misappropriated confidential and proprietary information in order to develop and market a drug competitive with ML 141. (*Id*. at 7.)

OncoGenerix brings a counterclaim which accuses Meridian of breaching the Agreement. According to OncoGenerix, Meridian failed to provide OncoGenerix *and* OncoMDG with the complete formula for ML 141, thereby preventing OncoGenerix from fulfilling its obligations under the Agreement. Specifically, OncoGenerix alleges that upon execution of the Agreement, "OncoGenerix and OncoMDG began working with Meridian in furtherance of the agreement" and "did all they could do with the information provided by Meridian." (Dkt. 15 at 13.) However, when it became apparent that "OncoMDG could not replicate the claimed results…OncoMDG informed Meridian that the formula was incomplete and requested the complete formula as submitted by Meridian to the FDA." (*Id*.) Although Meridian provided OncoGenerix and OncoMDG with "pieces of information relating to the ML 141 formula," Meridian did not supply the "actual formula sufficient to produce the drug." (*Id*.) When the project began to stall, OncoMDG again in July 2017 requested the full formula in one complete

document.  (*Id*. at 14.)  OncoGenerix alleges that Meridian did not provide the requested

information.  (*Id*.)  OncoGenerix seeks damages in the amount of $244,133.37 for the value of

uncompensated "work completed by OncoGenerix" under the Agreement.  (*Id.* at 15.)

With these facts in mind, the Court turns to the discovery issue at hand.

## II.    LEGAL ANALYSIS

Meridian has served requests for the production of documents which, among other things,

call for OncoGenerix to produce all documents relating to: (a) ML 141; (b) docetaxel; (c) the

Agreement; (d) OncoGenerix's capabilities and qualifications of personnel who were to perform

as required under the Agreement; (e) OncoGenerix's decision to place its performance on hold

on July 17, 2017; and (f) all communications between OncoGenerix and any person not a party

to this action relating to Meridian, ML 141, docetaxel, and this action.  OncoGenerix responded

to the requests with objections and by asserting that it would produce all non-privileged

responsive documents that were "within its custody or possession."  (*See* OncoGenerix's Resp.

to Meridian's First Req. for Prod.)

Meridian asserts that OncoMDG has responsive documents within its possession that

have not been produced in discovery and that OncoGenerix must produce these documents

because it has "control" of them within the meaning of Rule 34.  OncoGenerix asserts that it

should not be required to produce documents possessed solely by OncoMDG because: (a) it does

not "control" those documents within the meaning of Rule 34; (b) it has already produced all

responsive OncoMDG documents that were exchanged between Meridian and OncoMDG during

the execution of the Agreement and reproducing those documents would result in unnecessary

duplication; and (c) an order compelling OncoGenerix to produce OncoMDG's documents

would jeopardize the business relationship between the two companies.  (Tr. at 4-5, 9-10, 19-21, 24-25.)

### A.    Standard For Determining Whether A Party Has "Control" Over Documents In The Possession Of A Non-Party For Purposes Of Rule 34.

Under Federal Rule of Civil Procedure 34(a)(1), a party is required to produce documents that are within its "possession, custody, or control."  "On the issue of control, it is well-settled that a party need not have actual possession of the documents to be deemed in control of them; rather, the test is whether the party has a legal right to obtain them."  *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D.Ill. 2004) (internal quotations and citations omitted); *see also Thermal Design, Inc. v. Am. Soc'y of Housing, Refrigerating & Air-Conditioning Engineers, Inc.*, 755 F.3d 832, 838-39 (7th Cir. 2014) (citing test for control in *Dexia*); *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140 (3d Cir. 1988) ("Control is defined ... as the legal right to obtain the documents required on demand"), *quoting* C. Wright & A. Miller, 8 *Federal Practice & Procedure* § 2210.  "The determination of whether an entity has 'control' over documents under Fed. R. Civ. P. 34(a) is a 'very fact specific' inquiry."  *Davis v. Gamesa Tech. Corp.*, No. 08 C 4536, 2009 WL 3473391, at *2 (E.D.Pa. Oct. 20, 2009), *quoting Pitney Bowes, Inc., v. Kern Int'l., Inc.*, 239 F.R.D. 62, 66 (D.Conn. 2006).  The "party seeking production of documents bears the burden of establishing the opposing party's control over those documents."  *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 441 (D.N.J. 1991).

Where the moving party seeks to have a corporate party produce documents in the possession of a non-party corporation with which it has some sort of relationship (*i.e.,* as an affiliate, sister corporation, parent, or subsidiary), courts will determine the control issue by considering a number of factors including:

(1) commonality of ownership;

(2) exchange or intermingling of directors, officers, or employees of the two corporations;

(3) the exchange of documents in the ordinary course of business;

(4) the non-party's connection to the transaction at issue;

(5) any benefit or involvement by the non-party corporation in the litigation;

(6) the corporate party's marketing and/or servicing of the non-party company's products; and

(7) the financial relationship between the companies.

*In re Subpoena to Huawei Techs. Co., Ltd.,* 720 F.Supp.2d 969, 977 (N.D.Ill. 2010) (citing cases); *Wachovia Sec., LLC v. Loop Corp.*, No. 05 C 3788, 2008 WL 2625907, at *2 (N.D.Ill. June 27, 2008); *Super Film of Am., Inc. v. UCB Films, Inc.,* 219 F.R.D. 649, 655 (D.Kan. 2004); *Uniden Am. Corp. v. Ericsson Inc.,* 181 F.R.D. 302, 306 (M.D.N.C. 1998); *see also Afros S.P.A. v. Krauss-Maffei Corp.,* 113 F.R.D. 127, 130 (D.Del. 1986); *Cormack v. United States,* 117 Fed. Cl. 392, 402-03 (2014); *Steele Software Sys., Corp. v. DataQuick Info. Sys., Inc.,* 237 F.R.D. 561, 564 (D.Md. 2006) (noting that the specific form of the corporate relative involved does not matter when analyzing control under Rule 34).

### 1.   OncoGenerix and OncoMDG do not share a common owner.

OncoGenerix relies heavily on the fact that it is wholly owned by Marina Ivanova, OncoMDG is owned by Onco Generix China Ltd., and that Ms. Ivanova has no ownership interest in Onco Generix China Ltd.  As such, OncoGenerix and OncoMDG do not share a common owner at present.  This fact, however, is not dispositive because "[t]he control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation."  *St. Jude Med. S.C., Inc. v. Janssen-Counotte,* 305 F.R.D. 630, 638 (D.Or. 2015), *quoting Afros*, 113 F.R.D at 129; *Huawei Techs.,* 720 F.Supp.2d at 976 (same); *Cormack,* 117

Fed. Cl. at 402-03 (a party need not present evidence sufficient to pierce the corporate veil or establish an alter ego relationship between its opposing party and a non-party to establish "control" for purposes of Rule 34). Instead, Meridian need only establish that OncoGenerix is "able to obtain the documents in question to 'control' them." *Huawei Techs.,* 720 F.Supp.2d at 976.

Furthermore, the significance of the current ownership of OncoGenerix and OncoMDG is diminished by the evidence that Igor Ivanov (Ms. Ivanova's husband) had a prior ownership interest and was heavily involved in the affairs of both corporations during the times material to this lawsuit. Mr. Ivanov owned OncoGenerix until January 1, 2019. As such, he was owner of OncoGenerix throughout the entirety of its business relationship with Meridian and he owned the corporation at the time this lawsuit was filed on August 31, 2018. OncoMDG on its website identifies Mr. Ivanov as its Chairman of the Board, founder, and investor. The latter fact suggests that Mr. Ivanov had a financial stake in OncoMDG at some prior time. Thus, it appears that the same person both owned OncoGenerix and was the Chairman of the Board of OncoMDG when the operative events occurred.

## 2. Two senior OncoGenerix executives serve on OncoMDG's board of directors.

In addition to the ties that Igor Ivanov had with the two companies, the evidence shows that OncoGenerix's CEO and President Dmitry Itkin and its Chief Scientific Officer and V.P. of Business Development Dr. Roland Franke both serve on OncoMDG's Board of Directors. Moreover, Mr. Itkin executed the Agreement on behalf of OncoGenerix and was personally involved in the subject matter of this case. (Tr. at 18.) These facts weigh in favor of a finding of "control." *See, e.g., Afros*, 113 F.R.D. at 131 (noting that the overlap of directors and officers

should be considered in the analysis of control); *Uniden,* 181 F.R.D. at 306-07; *Steele* Software, 237 F.R.D. at 564 (citing cases).

### 3. OncoGenerix and OncoMDG exchanged documents in the ordinary course of business.

During the August 27 hearing, OncoGenerix's counsel made clear that OncoGenerix was in charge of communicating with Meridian, coordinating all of the documents, and ushering all of the information back and forth between OncoMDG, OncoGenerix, and Meridian. (Tr. at 4-5.) Counsel further indicated that OncoMDG copied OncoGenerix on all of its communications with Meridian and that OncoGenerix has produced all documents responsive to Meridian's requests that are in its possession. (Tr. at 5, 20.) Thus, it is evident that OncoGenerix was receiving OncoMDG's documents before and during the parties' performance of the Agreement. These facts also weigh in favor of a finding of "control." *See, e.g., Gerling,* 839 F.2d at 141 ("Where the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party"); *Davis*, 2009 WL 3473391, at *5 (considering the "free flow of information" and access to documents "in the ordinary course of business" in finding control); *Sanofi-Aventis v. Sandoz,* 272 F.R.D. 391, 396 (D.N.J. 2011) (noting the "free flow of exchange of information" between the party and its sister corporations as a factor in finding control).

### 4. OncoMDG was responsible for performing the substantive work that OncoGenerix promised to deliver under the Agreement.

During the August 27, 2019 hearing, OncoGenerix's counsel described the division of labor between OncoGenerix and OncoMDG under the Agreement as follows: "OncoGenerix USA mainly takes care of logistics, finance or financing, and [the] securing of essential

11

ingredients and equipment that is necessary, whereas the laboratory work is done by [OncoMDG]." (Tr. at 3.) As discussed above, *supra* in Section IB, OncoMDG's officers and employees prepared the Proposal and were members of the project team to perform the testing and manufacturing of ML 141, all of which undisputedly took place solely at OncoMDG's facility in China. In its own counterclaim, OncoGenerix describes how OncoMDG attempted to duplicate the ML 141 formula and contacted Meridian on several occasions for the full formula in order to perform the services under the Agreement. OncoGenerix has also admitted, albeit begrudgingly, that it "could not have performed all the services and tasks called for in the Service Provider Agreement" without the services and facilities of OncoMDG. (OncoGenerix's Supp. Resp. to Req. to Admit No. 41.)

Thus, although OncoGenerix may have initially procured the Agreement and facilitated communications with Meridian, the record reflects that OncoMDG was "not only involved," but should be considered "the main actor" performing the substantive services that OncoGenerix promised to deliver under the Agreement. [5] *In re Glob. Power Equip. Grp. Inc.,* 418 B.R. 833, 843-44 (Bankr.D.Del. 2009). Commensurate with its role, OncoMDG was expected to receive 90% (or $1,147,500) of the payments under the Agreement in consideration of its work while OncoGenerix was to receive the remaining 10% ($127,500) as a commission for procuring the deal. (Tr. at 11.)

In sum: "[a]s the party that actually did the work that forms the basis of the claims in dispute," OncoMDG was "inextricably intertwined" in the transaction at issue," which supports a

---

[5] The Court rejects OncoGenerix's attempt to analogize itself to a car salesman. (Tr. at 12, 17.) Unlike a salesman who merely commits to selling a Mercedes that had been produced in Germany, OncoGenerix promised under the Agreement that *OncoGenerix* would perform the work necessary to replicate ML 141 *and* deliver the finished product to Meridian. There is no mention of OncoMDG in the excerpt of the Agreement that has been provided to the Court.

finding of control under Rule 34. *Id.* at 844. Indeed, "[h]aving acted 'as one, with [OncoMDG] in the course of the transaction, [OncoGenerix] cannot now assert that it does not 'control' the documents relevant to the transaction." *Alimenta (U.S.A.), Inc. v. Anheuser-Busch Companies, Inc.,* 99 F.R.D. 309, 313 (N.D.Ga. 1983); *Super Film,* 219 F.R.D. at 656 (same); *Gerling,* 839 F.2d at 141 ("The requisite control has been found . . . where the litigating corporation had acted with its sister in effectuating the transaction giving rise to suit and is litigating on its behalf"); *Cormack*, 117 Fed. Cl. at 403 ("Courts can infer control from mutual involvement in the transaction at issue in the litigation."); *Sanofi-Aventis,* 272 F.R.D. at 395-96 (finding control where sister corporations "acted together in seeking FDA approval" of a generic drug and the non-party performed work that was "central to the claim of infringement"); *Burton Mech. Contractors, Inc. v. Foreman*, 148 F.R.D. 230, 236 (N.D.Ind. 1992) (Courts have "inferred the requisite control over documents where the existence of a close relationship between the party receiving the request and the non-party has been established."); *In re Glob. Power,* 418 B.R. at 842 ("where two sister corporations act as one in the transaction giving rise to the litigation, it may be presumed that there is control by one sister of the documents in possession of the other.").

5. **OncoMDG stands to benefit from OncoGenerix's success in this case and its employees and documents will provide evidentiary support for OncoGenerix's defense and counterclaim.**

The record shows that OncoMDG stands to benefit if OncoGenerix successfully defends against Meridian's claims and wins its own counterclaim. Specifically, Meridian seeks injunctive relief to enjoin OncoGenerix "from making any submission of any drug similar to ML 141 to any national or international governmental agency or department which regulates or approves the sale of pharmaceuticals." (Dkt. 35-1 at 9, 10.) OncoMDG, to the extent that it

seeks to continue operations in the United States, would be restrained if such an injunction were entered against OncoGenerix and it would benefit if such injunctive relief were denied.[6] OncoMDG's expected benefit if OncoGenerix prevails in this case is another factor weighing favor of control. *See, e.g., Afros,* 113 F.R.D. at 131 ("If the nonparty is to receive a benefit from the litigation, that fact along with others must be weighed in determining control for purposes of Rule 34"); *Super Film,* 219 F.R.D. at 655-56.

The record further shows that OncoMDG will be involved in this litigation. In its answer to interrogatory no. 1 of Meridian's first set of interrogatories, OncoGenerix identified sixteen employees of OncoMDG as witnesses that it may call on its behalf to address the claims and defenses asserted by Meridian and OncoGenerix in their respective pleadings. OncoGenerix also indicated that these OncoMDG employees should be contacted through OncoGenerix's counsel of record – who also represents OncoMDG. (OncoGenerix's Resp. to Second Set of Int. No. 1.) OncoGenerix's heavy reliance on OncoMDG's employees as its witnesses to support its defense and counterclaim – while listing only two employees of its own as witnesses – supports a finding of "control." *See, e.g., In re Glob. Power,* 418 B.R. at 844 (fact that the party disclosed eleven employees of its non-party sister corporation as witnesses while listing only two of its own employees supports finding of "control").

---

[6] It is unclear as to how an award of damages either for or against OncoGenerix would impact OncoMDG. The Court is not privy to the specifics of any agreement between OncoGenerix and OncoMDG that might address the issue of how the payment of a damages award against OncoGenerix would be apportioned (if at all) between the two corporations. OncoGenerix's counsel did indicate during the August 29 hearing that any award of damages on the counterclaim would go to OncoGenerix – notwithstanding the fact that the damages sought are almost twice OncoGenerix's expected commission – because it had already paid OncoMDG for any work it performed and expenses it incurred under the Agreement. (Tr. at 12-13.)

Moreover, notwithstanding OncoGenerix's counsel's non-committal statement at the August 27 hearing,[7] the Court finds that OncoGenerix will necessarily rely on OncoMDG's documents when defending against Meridian's claims and prosecuting its own counterclaim. There will be no other way for OncoGenerix to prove the core allegations of its counterclaim: namely, that:

> 17.     Upon execution of the Agreement, OncoGenerix and Onco MDG began working with Meridian in furtherance of their Agreement. OncoGenerix and Onco MDG performed significant amounts of work and did all they could with the information provided by Meridian. However, Meridian only provided OncoGenerix and Onco MDG with an incomplete formula for ML 141, and asked that they try it out, thereby preventing OncoGenerix and Onco MDG from performing the scale up portion of their services.

> 18.     Due to the incomplete formula provided by Meridian, Onco MDG could not replicate the claimed results. Onco MDG informed Meridian that the formula was incomplete and requested the compete formula as submitted by Meridian to the FDA. Although Meridian provided OncoGenerix and OncoMDG with pieces of information relating to the ML 141 formula, Meridian did not supply the actual formula sufficient to produce the drug, as required pursuant to the Agreement.

(Dkt. 15 at 13.) Only OncoMDG's employees and the documentation that they generated could substantiate these allegations. OncoGenerix, by its own admission, had nothing to do with the laboratory work concerning ML 141. (Tr. at 3.)

### 6.     OncoGenerix was created to market the services of OncoMDG.

In its submission, OncoGenerix asserts that it "was set up with one purpose – to be a sales representative of services offered by a plant located in Mudanjiang, China owned by OncoMDG." (OncoGenerix's Submission at 2.) To this end, by its own description, OncoGenerix "markets and sells services offered by" OncoMDG and holds itself out as the "exclusive distributor" for OncoMDG's services. (Dkt. 15 at 10; *see also*

---

[7] At the hearing, the Court asked counsel whether OncoGenerix intended to rely on documentation generated by OncoMDG to prove its counterclaim and counsel responded by stating that "[w]e haven't gotten that far." (Tr. at 3.)

www.oncogenerixusa.com (last visited September 10, 2019).)  OncoMDG likewise touts

OncoGenerix as its "exclusive distributor" on its website.  (*See*

https://www.oncogenerix.com/contact-us (last visited September 10, 2019).)  Courts have found

control under Rule 34 where a party serves as a marketer or distributer of a related non-party

corporation's services.  *See, e.g., Lindholm v. BMW of N. Am., LLC,* No. 3:15-CV-03003-RAL,

2016 WL 452315, at *4 (D.S.D. Feb. 5, 2016) (citing cases); *Cooper Indus., Inc. v. British

Aerospace, Inc.*, 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984) (where wholly-owned defendant

subsidiary was the marketer and servicer of parent's aircraft in the United States, it was found

"inconceivable" that subsidiary could not obtain aircraft manuals and related documents).

### 7.    OncoGenerix and OncoMDG have a financial relationship.

OncoGenerix handles the financing and logistics for OncoMDG with respect to the

latter's dealings in the United States.  (Tr. at 3, 12.)  And, according to OncoGenerix's counsel,

OncoGenerix was "responsible" for reimbursing OncoMDG for the expenses that it incurred

under the Agreement even though OncoGenerix did not receive full payment from Meridian.

(Tr. at 12-13.)  The financial tie between OncoGenerix and OncoMDG with respect to the work

performed under the Agreement supports a finding of "control."  *See Super Film,* 219 F.R.D. at

653 (noting that "the payment flow between SFT [the foreign non-party] and SFA [the party]

suggests that SFA is a sales and accounts receivable department for SFT's transactions in the

U.S.").

In sum:  in consideration of the above factors, the Court finds that Meridian has shown

that: (a) OncoGenerix and OncoMDG acted "as one" with respect to the Agreement and the

events material to this lawsuit; (b) the operations, interests, and leadership of the two

corporations are closely intertwined; and (c) OncoGenerix will rely heavily on OncoMDG's

employees and documents to defend against Meridian's claims and prosecute its own counterclaim. For these reasons, the Court finds that there is sufficiently close coordination between OncoGenerix and OncoMDG to find that OncoGenerix has "control" of the documents within the possession of OncoMDG within the meaning of Rule 34.[8]

**B.     OncoGenerix Will Not Be Required To Produce Duplicative Documents.**

OncoGenerix asserts that an order requiring it to produce OncoMDG documents is unnecessary because it has already produced all responsive documents and any further production would be duplicative. Again, according to OncoGenerix's counsel, "as the contracting party," OncoGenerix was copied on all communications between OncoMDG and Meridian, and OncoGenerix has already produced those communications. (Tr. at 4-5.)

The Court credits OncoGenerix's representation that it has produced all documents within its possession and custody reflecting the communications between OncoMDG, Meridian, and OncoGenerix. However, the fact that "some relevant documents were already produced" to Meridian does not end the inquiry. *See Wachovia,* 2008 WL 2625907, at *2. OncoGenerix ignores the very real probability that the universe of responsive documents within its possession,

---

[8]  The factual record here distinguishes this case from the decisions that OncoGenerix cited to in its submission. For example, in *Chaveriat v. Williams Pine Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993), where the Seventh Circuit held that "the fact that a party could obtain a document if it tried hard enough and maybe if it didn't try hard at all does not mean the document is in its possession, custody, or control," the party and non-party in question had "no legal relationship whatsoever." *Slabaugh v. State Farm & Cas. Co.,* No. 1:12-CV-01020-RLY-MJD, 2013 WL 4777206, at *5 (S.D.Ind. Sept. 5, 2013), *objections overruled,* No. 1:12-CV-01020-RLY-MJD, 2013 WL 12291530 (S.D.Ind. Nov. 26, 2013) (internal quotation marks omitted); *Engel v. Town of Roseland,* 3:06 CV 430, 2007 WL 2903196, at *4 (N.D.Ind. Oct. 1, 2007) (in *Chaveriat,* the requested documents were in the possession of "the sub-contractor of a subcontractor of the contractor who the party subject to the production had retained"). Similarly, in *Johansen v. GVN Michigan, Inc.,* No. 15 C 912, 2016 WL 9185323, at *1 (N.D.Ill. Apr. 27, 2016), the requested documents were in the possession of a "sub-sub-sub-contractor" that had no direct contractual relationship with the two parties from whom discovery was sought. Finally, in *Stella v. LVMH Perfumes & Cosmetics USA, Inc.,* No. 07 C 6509, 2009 WL 780890, at *2 (N.D.Ill. Mar. 23, 2009), the moving party failed – unlike in this case – to provide evidence sufficient to allow the court to find "close coordination" between the party and non-party.

custody, *and control* goes well beyond just communications between Meridian, OncoGenerix, and OncoMDG.[9] One could imagine that members of the OncoMDG project team regularly created documents and engaged in internal communications regarding ML 141. In fact, given the nature of the work at issue here, it is inconceivable that OncoMDG would *not* have generated internal documents and engaged in communications regarding its efforts to duplicate ML 141. It is likewise inconceivable that *all* such documents would have been shared with Meridian. The Court finds that such documents – which are within OncoGenerix's control under Rule 34 – are directly responsive to a number of Meridian's requests for production and should now be produced. (*See, e.g.,* Meridian's First Req. for Prod. Nos. 1, 2, 3, 4, 6, 7, 8, 9, 10, 15, 16, etc.) [10] As the Court made clear at the August 27 hearing, OncoGenerix need not produce duplicative documents and Meridian has offered to work with OncoGenerix to implement the appropriate de-duplication tools. (Tr. at 10.)

### C. OncoGenerix's Concern Regarding Its Business Relationship With OncoMDG Does Not Relieve OncoGenerix Of Its Obligation To Produce Documents Within Its Control.

Lastly, OncoGenerix argues that the Court should not order it to produce documents that are in the possession of OncoMDG even if they are within OncoGenerix's control because such an order will jeopardize its business relationship and future endeavors with OncoMDG. [11] (Tr. at

---

[9] Tellingly, in the majority of its responses to Meridian's first set of requests for production, OncoGenerix responds that, over any stated objections, it will produce all responsive documents within its custody or possession with no mention of documents that are in its "control." (*See* OncoGenerix's Resp. to Req. for Prod. Nos. 1, 2, 6, 7, 8, 9, 10, 13, 14, 15, 16, 20, 22.)

[10] Meridian's counsel is encouraged to meet and confer with counsel for OncoGenerix to discuss which additional requests for production might fall within the scope of this order.

[11] The Court notes that OncoGenerix has not argued that Chinese law prevents production of responsive documents. In any event, "[t]he fact that foreign law may subject a person to criminal sanctions in the foreign country if he produces certain information does not automatically bar a domestic court from compelling production." *United States v. First Nat. Bank of Chicago*, 699 F.2d 341, 345 (7th Cir. 1983).

19-21.)  OncoGenerix offers further assurance that it will assist in obtaining documents from

OncoMDG as "it is not in [OncoGenerix's] interest to hide anything."  (Tr. at 19.)  While the

Court does not doubt that OncoGenerix would assist in procuring documents from OncoMDG,

OncoGenerix's argument is unpersuasive for the following reasons.

First, absent a court order, nothing would prevent OncoMDG – which stands to benefit if

OncoGenerix wins this case – from choosing to disclose documents that support OncoGenerix's

counterclaim and defense while withholding those documents that might hurt OncoGenerix.

Under this scenario, Meridian would have no means by which to obtain the universe of

documents relevant to prove its claims or to defend against OncoGenerix's counterclaim without

trying to initiate discovery against OncoMDG in China under Chinese law.  This would be an

"unjust" and "unacceptable" outcome.  *See Afros,* 113 F.R.D. at 131; *Super Film*, 219 F.R.D. at

654 ("a third party with a substantial interest in the litigation may be allowed to frustrate the

rules of discovery to the disadvantage of the party seeking production and, ultimately, of the

court.").

Second, the nature of the Agreement – which required OncoGenerix to undertake the

necessary work to support an application to the FDA for ML 141 – provides another reason why

it would be inequitable to excuse OncoGenerix from producing responsive documents in

OncoMDG's possession.  As OncoGenerix's counsel acknowledged at the August 29 hearing,

(Tr. at 16-17), Meridian would be required to submit extensive documentation from OncoMDG

to the FDA and other regulatory bodies in order to obtain approval of the application for ML

141.  Given that OncoGenerix would voluntarily obtain and provide to Meridian all necessary

documentation from OncoMDG to fulfill its obligations under the Agreement, it should not now

be excused from producing this responsive documentation that is within OncoMDG's possession. *See, e.g., Sanofi-Aventis,* 272 F.R.D. at 395-96.[12]

Finally, OncoGenerix has invoked the jurisdiction and process of this court to bring its counterclaim seeking the recovery of a six figure sum that it claims that it is owed under the Agreement. Having done so, OncoGenerix cannot rely on the corporate boundary between OncoMDG and itself to "circumvent the development of the facts necessary for a fair trial of this case." *See Alimenta (U.S.A.)*, 99 F.R.D. at 313.

In sum: while OncoGenerix might face unwanted business consequences as a result of this order, such consequences flow from OncoGenerix's decision to structure the Agreement as it did and from OncoMDG's decision to do business in the United States. For the reasons stated above, OncoGenerix's business concerns do not serve as a bar to producing documents in its control under Rule 34.

## CONCLUSION

For the foregoing reasons, the Court finds that OncoGenerix is in "control" of responsive documents that are in the physical possession of OncoMDG within the meaning of Federal Rule of Civil Procedure 34. OncoGenerix is directed to fully respond to Meridian's requests for

---

[12] In *Sanofi-Aventis,* defendant Sandoz worked with a foreign sister corporation (Lek) to obtain FDA approval of a generic drug. *Sanofi-Aventis,* 272 F.R.D. at 395. Lek developed and manufactured the generic product at the behest of Sandoz. *Id.* The plaintiff sought to have Sandoz produce discoverable information from Lek and Sandoz objected. The court held that:

> Sandoz cannot use its foreign affiliation with Lek as both a sword and a shield. Sandoz has relied on Lek in its submissions made to the FDA in connection with its ANDA. Information gathered from Lek's supplemental testing will be provided, much like the initial testing, to the FDA for further consideration under the revised guidelines. Sandoz now attempts to block discovery of these very activities because it claims this information is not 'reasonably available.' . . . Sandoz cannot have it both ways. Common sense and traditional notions of justice demand that Sandoz is required to produce discovery about Lek in this litigation as it would voluntarily in the ANDA process.

*Id.* at 396.

production by producing by October 18, 2019 all further responsive documents that are in the possession of OncoMDG.


**ENTERED:**

Jeffrey I. Cummings
**United States Magistrate Judge**

**Dated: September 11, 2019**