UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERIDIAN LABORATORIES, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 18 C 6007 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| ONCOGENERIX USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

In this commercial dispute, plaintiff Meridian Laboratories, Inc. ("Meridian") has filed a
second amended complaint against defendant OncoGenerix USA, Inc. ("OncoGenerix"), asserting
claims of breach of contract, fraud, and misappropriation of trade secrets. Defendant moves to
dismiss the claims in Counts III, V and VI of plaintiff's amended complaint. For the following
reasons, the motion is denied.

BACKGROUND

The following facts are alleged in the second amended complaint and are assumed true for
purposes of the present motion to dismiss. Plaintiff, Meridian Laboratories, Inc., is a drug
development company located in Buffalo Grove, Illinois. At great expense, Meridian has
developed a proprietary formulation of docetaxel known as ML 141. Docetaxel is a compound
that has been known for years to be an effective treatment for many forms of cancer, but, according
to Meridian, it was generally available only in formulations containing stabilizing ingredients,
including tween 80 and ethanol, that cause serious side effects. The presence of these stabilizing
ingredients limits the amount of docetaxel that can be delivered per dose, which limits the
effectiveness of docetaxel as a cancer treatment. Meridian's ML 141 product, however, is both

stable and free from these dangerous stabilizing ingredients, which allows patients to tolerate higher doses, leading to improved treatment outcomes.

As part of its preparations for bringing ML 141 to market, Meridian sought a vendor through which it could manufacture large batches of the product. Roland Franke, the general counsel of a Meridian supplier, introduced William Zhao, Meridian's CEO, to OncoGenerix as a potential contract manufacturing organization ("CMO"). A series of meetings and communications between Meridian and OncoGenerix followed. From March 6, 2016, to March 8, 2016, Zhao visited OncoGenerix's facility in Mundanjiang, China, meeting with OncoGenerix representatives Dmitry Itkin, Edwin Rodriguez, and Austin McDonald, each of whom represented that OncoGenerix had the capability to timely and competently manufacture ML 141 for Meridian. On March 28, 2016, Meridian tendered a request for proposal setting forth its requirements, and on April 18, 2016, OncoGenerix submitted a response, in which it represented that it had the "capability and intention" to fulfill Meridian's requirements. (2d Am. Compl. ¶ 18c, ECF No. 74.) On May 15 and 16, 2016, Zhao returned to the OncoGenerix facility in China with two scientists from the laboratory that had developed ML 141 for Meridian, and OncoGenerix representatives assured Zhao that OncoGenerix had the "capability and intention" to manufacture ML 141 for Meridian on a timely basis. (*Id.* ¶ 18d.) On May 25 and 26, 2016, OncoGenerix representatives Edwin Rodriguez and Zhen Li visited the laboratory in Nanjing, China, that had developed ML 141 for Meridian, ostensibly to learn details of the ML 141 manufacturing project, and again they assured Meridian that they had the "capability and intention" to manufacture ML 141 for Meridian. (*Id.* ¶ 18e.) On July 22, 2016, OncoGenerix's management team, including Dmitry Itkin, Roland Franke (who had moved to OncoGenerix as Chief Scientific Officer and Vice President of Business Development), and Austin McDonald, visited Meridian's Buffalo Grove, Illinois offices

to meet with a team of Meridian representatives including Zhao, John Thottatail and Denise Smith. The parties discussed OncoGenerix's "purported capability of acting as CMO for the ML 141 project," and the OncoGenerix representatives again assured Meridian that OncoGenerix could handle the project.  (2d Am. Compl. ¶ 18f.)

On September 26, 2016, in reliance on these representations, Meridian entered into a Service Provider Agreement ("SPA") with OncoGenerix, in which OncoGenerix agreed to undertake process development, stability filling, and stability testing of ML 141.  In early 2017, believing based on its relationship with OncoGenerix that it was positioned to produce large quantities of ML 141, Meridian entered into a contract with a large international pharmaceutical distributor to market ML 141 in the United States and Canada. (Meridian does not name the distributor, citing confidentiality provisions of their contract.)  Under the contract with the distributor, if sales were strong, Meridian stood to earn milestone payments of more than $10,000,000, "the majority of which was directly dependent upon the timely performance of OncoGenerix in testing and manufacturing sufficient quantities of ML 141."  (2d Am. Compl. ¶ 24.) OncoGenerix participated in communications with the distributor and was aware of the terms of the contract and its own role in Meridian's performance.

In the course of its performance of its obligations under the SPA, and subject to the SPA's confidentiality provisions, Meridian disclosed "key trade secrets" to OncoGenerix, including the formula for ML 141, specific laboratory techniques for its production, vendors for inputs to ML 141, the identities of contacts at the distributor, terms of Meridian's agreement with the distributor, and methods and strategies for the commercialization of ML 141.  (*Id.* ¶ 23.)  Under the SPA, Meridian paid OncoGenerix "hundreds of thousands" of dollars (*id.* ¶ 26), and Meridian reiterated in numerous communications with OncoGenerix that its timely performance was essential and of

the utmost importance, but OncoGenerix still failed to timely perform its obligations. In an email dated July 17, 2017, OncoGenerix informed Meridian that it was placing its performance "on hold."

On August 28, 2017, Meridian wrote to OncoGenerix that the latter was in breach of contract and Meridian would terminate the SPA if OncoGenerix did not cure the breaches within ten days. OncoGenerix still failed to cure the breaches, and Meridian terminated the SPA on September 15, 2017. OncoGenerix refused to refund the amounts Meridian had paid under the SPA. Because of OncoGenerix's failure to timely perform under the SPA, Meridian missed out on the milestone payments from the distributor that it otherwise would have received.

OncoGenerix had told Meridian that it was unable to perform because Meridian had not provided it with the complete formula for ML 141. But, after terminating the SPA, Meridian retained another vendor who, with the same information Meridian had given OncoGenerix, completed in a few weeks the work that OncoGenerix had been unable to complete in a year. Meridian subsequently learned from a third party that OncoGenerix is currently attempting to develop its own drug to compete with ML 141. Upon following up with further communications with the third party and receiving email communications sent by OncoGenerix, Meridian has learned that OncoGenerix has been contacting suppliers and is engaged in development of a product identical to ML 141 in OncoGenerix's China laboratory.

Meridian filed this suit in 2018, asserting diversity jurisdiction. Meridian's second amended complaint consists of six counts: Count I, for breach of contract by failing to provide the services Meridian paid for under the SPA; Count II, for an injunction to prohibit OncoGenerix from using Meridian's confidential information pursuant to section 5.2 of the SPA; Count III, for an injunction pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/3, to prohibit OncoGenerix

from using Meridian's trade secrets to commercialize any drug similar to ML 141; Count IV, for breach of contract by misusing Meridian's confidential and proprietary information to develop a drug competing with ML 141; Count V, captioned as "Misappropriation of Trade Secrets," for violating the "confidentiality and non-disclosure provisions" of the SPA by "us[ing] and threaten[ing] to use Meridian's confidential information for its own business purposes in its attempt to develop and market a competitive drug to ML 141" (2d Am. Compl. ¶¶ 74-76); and Count VI, for fraud by falsely representing that OncoGenerix had the capability to timely perform under the SPA in order to induce Meridian not only to make payments for services it would not receive, but also "to induce Meridian to disclose confidential and proprietary information which OncoGenerix intended to misappropriate to develop its own competing drug" (2d Am. Compl. ¶ 80).

## <u>ANALYSIS</u>

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (internal quotation altered)).

Under federal notice-pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.at 556). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts must] accept the well-pleaded facts in the complaint as true, but [they] 'need[ ] not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013) (quoting *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009)).

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud," apart from "[m]alice, intent, knowledge, and other conditions of a person's mind," which "may be alleged generally." The requirement that circumstances of fraud be pleaded with particularity "ensures that plaintiffs do their homework before filing suit and protects defendants from baseless suits that tarnish reputations." *Pirelli Armstrong Tire Corp. Retiree Med. Ben. Trust v. Walgreen Co.*, 631 F.3d 436, 439 (7th Cir. 2011). Ordinarily, a fraud plaintiff's complaint must include such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated," *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008), or, as the Seventh Circuit has "often incanted," the "'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Pirelli*, 631 F.3d at 441-42 (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). However, the "exact level of particularity that is required will necessarily differ based on the facts of the case," *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011), and courts must not "take an overly rigid view of the formulation." *Pirelli*, 631 F.3d at 442.

6

Defendant argues that plaintiff fails to state a claim of (1) fraud in Count VI, both because the allegations are merely of false promises of future performance, indistinguishable from a breach of contract, and because they lack the particularity required by Rule 9(b); and (2) misappropriation of trade secrets in Counts III and V because plaintiff fails to allege the existence of a protected trade secret.

## I.     FRAUD

Under Illinois law, the elements of a cause of action for fraud are as follows: "[1] a false statement of material fact; [2] knowledge by defendant that the statement is false; [3] intent to induce the other party to act; [4] reliance by plaintiff on that misrepresentation; and [5] injury caused by that reliance." *Hassan v. Yusuf*, 944 N.E.2d 895, 910 (Ill. App. Ct. 2011).

### A.  Promissory Fraud

As a general rule, a fraud claim cannot be based on a "false representation of intention or future conduct, but there is a recognized exception where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *Steinberg v. Chi. Medical Sch.*, 371 N.E.2d 634, 641 (Ill. 1977); *see Henderson Square Condo. Ass'n v. LAB Townhomes, LLC*, 46 N.E.3d 706, 714 n. 2 (Ill. 2015); *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672 (Ill. 1989); *Stamatakis Indus., Inc. v. King,* 520 N.E.2d 770, 772-73 (Ill. App. Ct. 1987).  In order to state a claim of this type of fraud, known as "promissory fraud," plaintiff "must be able to point to specific, objective manifestations of fraudulent intent— a scheme or device.'" *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (quoting *Hollymatic Corp. v. Holly Sys., Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985)).  "If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed." *Id.* "The distinguishing features of a

7

'scheme,' however, are not clear in Illinois case law," and some courts have concluded that "the exception seems to engulf the general rule because, '[a]s fraud occurs when a misrepresentation is made with intent to induce a victim to rely thereon and a victim is deceived and relies thereon to his detriment, such misrepresentations are ordinarily the schemes by which the victim is defrauded regardless of whether the misrepresentation is as to the declarant's future intent or otherwise.'" *Gen. Elec. Credit Auto Lease, Inc. v. Jankuski*, 532 N.E.2d 361, 364 (Ill. App. Ct. 1988) (quoting *Vance Pearson, Inc. v. Alexander*, 408 N.E.2d 782, 787 (Ill. App. Ct. 1980)).

According to defendant, a "scheme" must consist of a "pattern" of fraudulent acts or promises, such that the claim does not "rest on proving . . . a single unfulfilled promise." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). Defendant argues that plaintiff's claim rests on nothing more than a single alleged misrepresentation: that OncoGenerix said it "'had the capability and intention to competently and timely act as CMO for the ML 141 project.'" (Def.'s Mem. in Supp. of Mot. to Dismiss at 8, ECF No. 76 (quoting 2d Am. Compl. ¶ 18c-e).) Defendant views this as an allegation of a false representation of intent to perform future conduct (namely, to perform contractual obligations under the SPA), but argues that it is unaccompanied by the requisite allegations of a "pattern" of fraudulent acts necessary to state a claim of promissory fraud.

In response, plaintiff states that it "does not allege only promissory fraud[; it] alleges that OncoGenerix misrepresented its capabilities and that those representations were false when made." (Pl.'s Resp. Br. at 5, ECF No. 77.) The Court agrees that plaintiff alleges that defendant made misrepresentations not only of future "intention" (2d Am. Compl. ¶ 18c-e) but also apparently of present "capability" (2d Am. Compl. ¶ 18c-e), some of which appear to be separate from and independent of intention (*see* 2d Am. Compl. ¶ 18a, f). But the Court need not consider the

8

statements of present capability separately from the statements of future intention; even if the Court views the claim as a whole through the lens of promissory fraud, plaintiff states a claim that is plausible on its face.

Plaintiff alleges that OncoGenerix made the offending misrepresentations not on a single occasion but on numerous occasions throughout the process of negotiating the SPA: first, in a series of meetings from March 6 to March 8, 2016; then, in OncoGenerix's response to Meridian's request for proposal on April 18, 2016; then during Meridian's visit to OncoGenerix on May 15 and 16, 2016; then on May 25 and 26 when OncoGenerix representatives visited Meridian's lab in China, and finally on July 22, 2016 during OncoGenerix's visit to Meridian's lab in Illinois. (*Id.* ¶ 18a-f.) In these allegations, plaintiff has "show[n] a pattern" of misrepresentations, rather than "rest[ed] on [alleging] a single unfulfilled promise," just as the law requires. *Speakers of Sport*, 178 F.3d at 866.

Defendant replies that the same misrepresentation repeated several different times is not the sort of pattern that amounts to a "scheme" (Reply Br. at 2-3), but the cases it cites do not support its position. One of them explicitly recognizes that "a fraudulent scheme may exist where a defendant repeatedly lies to the same plaintiff," provided the lies represent or are accompanied by "objective manifestations of fraudulent intent." *Zic v. Italian Gov't Travel Office*, 149 F. Supp. 2d 473, 477 (N.D. Ill. 2001) (plaintiff stated fraud claim by alleging that his employer "repeatedly promised that any new contracts would include retroactive pay and seniority" and the employer "fraudulently represented to [plaintiff] that the Chicago office was closing, an event he says would terminate his contract[, in] an attempt to avoid paying benefits due to him under the contract").

Several Illinois decisions illustrate that a fraud claim may arise out of a defendant's misrepresentations to the plaintiff in the course of negotiating a transaction between the parties,

provided there is more than just a broken promise to indicate fraudulent intent at the time of the negotiations. For example, in *Stamakis*, the plaintiffs alleged that they purchased a company based on a defendant shareholder's representations that he would remain employed by the company to maintain its business for some years even after the transaction closed, but the defendant did not disclose certain circumstances that made him unlikely to remain for long.[1] 520 N.E.2d at 773. Predictably, he ended up leaving the company only nine months after the transaction, in violation of the parties' agreement. *Id.* The court recognized that it is "'not easy'" to distinguish between the "'general rule'" that a false promise of future conduct is not fraud and the "'exception'" for a false promise that is "'the scheme to accomplish a fraud,'" and in practice the exception "'tends to engulf and devour much of the general rule.'" *Id.* at 772 (quoting *Vance Pearson*, 408 N.E.2d at 787). "Considering [that] the concept of a scheme" had been interpreted broadly by Illinois courts,[2] the court held that "the protracted negotiations between [the parties] show[ed] that a scheme was alleged." *Stamakis*, 520 N.E.2d at 773; *see also Ronan v. Rittmueller*, 434 N.E.2d 38, 43 (Ill. App. Ct. 1982) (recognizing that "[e]ven a false representation of intention or future conduct, if amounting to a matter of fact, has been held to support an action for fraud," and holding that defendant home builder's false and unfulfilled promises to "purchase

---

[1] Prior to the transaction, the defendant had engaged the company to purchase equipment that he knew it could not afford, and he knew that if the new owners did not complete the purchase of the equipment, he would not remain in the company's employment. Following the close of the transaction, the new owners declined to complete the purchase.

[2] The court cited two decisions in particular: *Roda v. Berko*, 81 N.E.2d 912, 915 (Ill. 1948), and *Vance Pearson*, 408 N.E.2d at 785. The court explained that in *Roda*, the Illinois Supreme Court had found a "scheme or device" based on what it called the defendant's "deliberate fraud by which a party had been induced to act to his damage," evidenced by something "other than the broken promise," 81 N.E.2d 912, 915 (Ill. 1948), but "the scheme was only a fraudulent promise that the property of the defrauded party would be used in a particular way," *Stamakis*, 520 N.E.2d at 772. Similarly, in *Vance Pearson*, the Illinois Appellate Court had held that the defendant's false promise to install a set of truck scales by a certain date, which the defendant made knowing that "he could not meet that date," *Vance Pearson*, 408 N.E.2d at 785, as he missed similar deadlines in other transactions, was "a scheme to accomplish a fraud," *Stamakis*, 520 N.E.2d at 773.

materials in advance of an alleged price increase, add a carpenter crew and build plaintiffs' house at once, completing it by Christmas," which were made "*without the intent or ability* to perform while intending plaintiffs to rely upon them, demonstrated a scheme to defraud plaintiffs and were actionable") (emphasis added) (citing *Vance Pearson*, 408 N.E.2d at 785). Subsequent cases have similarly applied the exception rather than the "general rule" in similar circumstances. *See Gagnon v. Schickel*, 983 N.E.2d 1044, 1054 (Ill. App. Ct. 2012) ("The trial court found that '[i]t is clear from the evidence that [defendant] promised to quit claim one half of the Tinley Park property to Plaintiff' but 'never intended to do so.' This intentional misrepresentation amounts to a scheme to defraud, so that her promissory fraud is, in fact, actionable."); *Hassan*, 944 N.E.2d at 915 (defendant's "represent[ation] to plaintiff that his contribution was for a one-third interest in the gas station, with real estate," when he "did not intend to convey any interest in the real estate to plaintiff," was a scheme employed to accomplish fraud).

Defendant also cites *Speakers of Sport*, 178 F.3d at 866, and *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995) *cited in Speakers of Sport*, 178 F.3d at 866, but neither case holds that a repeated misrepresentation cannot show a scheme to defraud, nor does the reasoning of either decision support any such conclusion. To the extent either case suggests that a scheme may be identified by a pattern of misrepresentations, the suggestion is rooted in the basic principle that fraud suits should be "based on . . . more than an allegation of a fraudulent promise," in order to avoid the "risk of turning every breach of contract suit into a fraud suit," *Desnick*, 44 F.3d at 1354, and "reduce[] the likelihood of a spurious suit," *Speakers of Sport*, 178 F.3d at 866, given that "fraud is easy to allege and difficult to prove or disprove," *Bower*, 978 F.2d at 1012.

11

Plaintiff's claim rests on more than defendant's mere breach of its contractual promises. Not only does it rest on repeated misrepresentations and broken promises made during the negotiation of the contract, which courts have found to be enough in similar circumstances, but it also rests on allegations of post-contract revelations that tend to show that defendant's earlier misrepresentations were made with fraudulent intent. Defendant overlooks the allegation that plaintiff has learned, in part by obtaining email messages sent by OncoGenerix to third parties, that OncoGenerix is "currently attempting to create a competitive drug to ML 141" and has been "contacting suppliers" and "engaged in development of a product identical to ML 141 in OncoGenerix's China laboratory." (2d Am. Compl. ¶¶ 45-46; *see* Am. Compl., Ex. B, ECF No. 57.) Further, plaintiff alleges that OncoGenerix attempted to excuse its nonperformance by claiming that Meridian had not provided it with the complete formula for ML 141—but another contractor was able to perform the services Meridian required with the same information Meridian had provided to OncoGenerix. These allegations support Meridian's inference that OncoGenerix lied about having the "capability and intention" to produce ML 141 for Meridian so that it could use Meridian's confidential information to produce ML 141 for itself. Stated differently, these allegations provide "specific, objective manifestations of fraudulent intent" of the sort necessary to indicate a "scheme" to defraud. *See Bower*, 978 F.2d at 1012; *Zic*, 149 F. Supp. 2d at 477.

In this case, as in *Stamatakis*, plaintiff has alleged that there were "protracted negotiations" over several months, during which the parties had ample opportunity to learn what they needed from one another in order to make the relationship work, and defendant allegedly made repeated misrepresentations concerning its capability and intention—or its "intent and ability," *Ronan*, 434 N.E.2d at 43—to perform the work it had promised to do for Meridian. Whether defendant made numerous different misrepresentations or one misrepresentation numerous times makes little

12

difference; what matters is that plaintiff has alleged a number of false representations during protracted negotiations. When these allegations are coupled with the allegations of OncoGenerix's post-contract-period efforts to develop a competing product and of Meridian's other contractor's ability to perform on time without experiencing the difficulties OncoGenerix did, they amount to "specific manifestations of fraudulent intent," *Bower*, 978 F.2d at 1012, that provide a plausible, non-speculative basis to distinguish plaintiff's failure to perform from a mere broken promise or "'change of mind,'" *id.* (quoting *Price v. Highland Cmty. Bank*, 722 F. Supp. 454, 459 (N.D. Ill. 1989) (Posner, J.)).

Plaintiff has "give[n] enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[Under Rule 8,] the court will ask itself *could* these things have happened, not *did* they happen."). Plaintiff has stated a plausible claim for fraud arising out of OncoGenerix's false representations that it was capable of and intended to perform the services described in the SPA for Meridian.

### B. Rule 9(b)

That leaves the question of whether plaintiff alleges the circumstances constituting fraud with the particularity required by Rule 9(b). Defendant argues that plaintiff's allegations that OncoGenerix misrepresented its "capability and intention" to provide manufacturing services do not state the content of the alleged misrepresentations with sufficient particularity. According to defendant, plaintiff does not state what "specific capabilities" OncoGenerix lacked but claimed to have; for example, the complaint does not reveal whether the misrepresentations pertained to OncoGenerix's personnel,[3] equipment, facilities, licensure or certification, or anything else. (Def.'s Mem. at 7.) Defendant contends that Rule 9(b) requires more specifics.

---

[3] In fact, Meridian does allege that "OncoGenerix made representations to Meridian regarding its capabilities and *personnel*" (2d Am. Compl. ¶ 39), although the allegation is no more detailed than that.

Rule 9(b) requires plaintiffs to "'use some . . . means of injecting precision and some measure of substantiation into their allegations of fraud.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting 2 Moore's Federal Practice § 9.03[1][b] (2020)). The precise details that the complaint must contain "may vary on the facts of a given case." *Pirelli*, 631 F.3d at 442. In another case, more specifics about the content of the alleged misrepresentations might be necessary, but in the circumstances of this case, the Court does not agree that Rule 9(b) required plaintiff to allege what transpired during the meetings in the granular detail defendant describes.

To begin with, plaintiff has alleged the precise date and location of the meetings at which OncoGenerix made the alleged misrepresentations, how the misrepresentations were communicated and to whom, and which persons participated in the meetings—which is more detail than the plaintiffs provided in the cases defendant cites (which are anyhow non-binding district court decisions). In those cases, the plaintiffs failed precisely to allege the time, place, or method of communication of particular misrepresentations. *See Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724, 738 (N.D. Ill. 2015) ("To satisfy Rule 9(b), Plaintiff must identify a specific misrepresentation that he saw, the date he saw it, and where he saw it."); *Reschke v. Pactiv, LLC*, No. 1:14-CV-04656, 2014 WL 7054143, at *2 (N.D. Ill. Dec. 12, 2014) ("Plaintiff fails to allege any specific facts . . . such as: who made the alleged misrepresentation, the content of the misrepresentation, when and where Defendant made the misrepresentation, or the means of communication through which Plaintiff received the misrepresentation.").

Plaintiff need not "exclude all possibility of honesty in order to give the particulars of fraud," *Lusby*, 570 F.3d at 854-55, nor need it "explain in [the] complaint *why* the [misrepresentation] was false," *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 780

(7th Cir. 2016). "It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Lusby*, 570 F.3d at 854-55. Plaintiff must "'provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless,'" so defendant can quickly neutralize the risk of "stigmatic injury that potentially results from allegations of fraud." *Presser*, 836 F.3d at 776 (quoting *Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005)); *see Fid. Nat. Title Ins. Co.*, 412 F.3d at 749 ("[The particularity requirement] forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen against spurious fraud claims."); *see also Hanna*, 834 F.3d at 779 ("Indeed, the purpose of Rule 9(b) is to 'force the plaintiff to do more than the usual investigation before filing his complaint.'") (quoting *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999)).

Plaintiff has alleged that, at particular meetings on particular dates, defendant misled plaintiff to believe that it was willing and able to serve as a manufacturing partner for ML 141, which is enough to "show . . . the nature of the charge" and "what the fraud entails." *Lusby*, 570 F.3d at 854-55 (plaintiff stated fraud claim although the precise document containing the alleged misrepresentation to the government was missing). Defendant is on notice of when, where, and by whom the fraudulent representations that plaintiff complains of were allegedly made, so defendant can quickly investigate the substance of those discussions and, if plaintiff's claims are groundless, it can "riposte swiftly and effectively." This is not the sort of case that presents a risk that the plaintiff filed suit as a "'fishing expedition'" without having done a "careful pretrial investigation," *Presser*, 836 F.3d at 776 (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994)), because plaintiff's allegations arise out of meetings attended solely

15

by representatives of plaintiff and defendant, the parties know what transpired there, and if what transpired there was not fraudulent, then plaintiff's claims will be easily disproved.

"To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)." *Lusby*, 570 F.3d at 855. Plaintiff's "complaint may be wrong." *Id.* It may be that there was some misunderstanding or miscommunication, or that OncoGenerix honestly believed at the time of contracting it could do what Meridian required of it. If so, then defendant will prevail; but "[n]o complaint needs to rule out all possible defenses." *Id.* What Rule 9(b) requires, at bottom, is that the plaintiff allege sufficient facts to "'enable[ the d]efendants to defend [the] action.'" *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at *9 (N.D. Ill. Dec. 6, 2017) (quoting *FTC v. DeVry Educ. Grp., Inc.,* No. CV-16-00579, 2016 WL 6821112, at *6 (C.D. Cal. May 9, 2016)). Plaintiff has done that here.

Plaintiff states a plausible claim under a promissory fraud theory, and it alleges the circumstances constituting fraud with the particularity required by Rule 9(b). Defendant's motion to dismiss Count VI is denied.

## II.    TRADE SECRETS

In Counts III and V, plaintiff claims that defendant has misappropriated its trade secrets under the Illinois Trade Secrets Act. The Act defines a trade secret as follows:

> (d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

16

765 ILCS 1065/2. Thus, "[r]egardless of exactly what type of information or what form it exists in, to be a trade secret the information must be (1) 'sufficiently secret to impart economic value because of its relative secrecy' and (2) the Plaintiff must make 'reasonable efforts to maintain the secrecy of the information.'" *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019) (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003)).

Defendant argues that plaintiff has not alleged the existence of trade secrets meeting the Illinois Trade Secrets Act's definition because it has not alleged that it made reasonable efforts to maintain their secrecy. Plaintiff does not specifically allege that it did anything more to protect its trade secrets—which include "the formula for ML 141, specific laboratory techniques for the production of ML 141, vendors for inputs to ML 141, the identities of [distributor contacts], terms of Meridian's agreement with [the distributor,] and methods and strategies for the commercial exploitation of ML 141" (2d Am. Compl. ¶ 23)— than include confidentiality and non-disclosure provisions in the SPA, and defendant argues that plaintiff falls short of its pleading burden by failing to allege more.

The Court is not convinced. The two district court decisions that defendant cites are not particularly analogous—in both cases, the alleged trade secrets were customer lists or other business information that was not obviously closely protected. *See Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2018 WL 1156246, at *3 (N.D. Ill. Mar. 5, 2018); *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 851 (N.D. Ill. 2011). The only precedential Illinois decision that either case cited on this point involved a "glaringly nonsecret" customer list composed of publicly available information (among other information that *did* qualify as protectable trade secrets because the plaintiff "restrict[ed] access" to it). *See Alpha Sch. Bus Co. v. Wagner*, 910 N.E.2d 1134, 1153 (Ill. App. Ct. 2009); *but see id.* at 1154.

17

In some circumstances, such as where the claimed trade secret is a customer list and the claimed precautionary measure a confidentiality agreement given to employees, the confidentiality agreement alone may not suffice to show that the plaintiff took reasonable efforts to maintain secrecy. *See Arcor v. Haas*, 842 N.E.2d 265, 271 (Ill. App. Ct. 2005) (holding that preliminary injunction was unwarranted because making employees sign confidentiality agreement was not sufficient effort, by itself, to maintain secrecy of customer lists); *see also First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 842 (C.D. Ill. 2014) (explaining that in such cases, "employers must [also] show employee understanding of confidentiality"). But it does not follow that a confidentiality agreement is an insufficient precaution in *all* circumstances, nor are courts generally in a position to say what precautions are reasonable at the pleading stage. "[O]nly in an extreme case can what is a reasonable precaution be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Learning Curve Toys*, 342 F.3d at 725 (internal quotation marks omitted); *see also Tax Track Sys. Corp. v. New Investor World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007) ("Typically, what [protective] measures are reasonable in a given [trade secret] case is an issue for a jury."). In *Learning Curve Toys*, 342 F.3d at 717, the plaintiff and defendant met to discuss whether the plaintiff might serve as a manufacturing contractor for the defendant, and during the meeting, the plaintiff asked the defendant to keep the information it disclosed confidential. After defendant agreed, the plaintiff revealed a confidential design for a product in development, and the defendant stole the design for its own products. *Id.* at 718. The jury found that, by entering into the oral confidentiality agreement, the plaintiff had taken reasonable measures to guard the secrecy of the product designs, and the Seventh Circuit upheld the verdict. *Id.* at 725-26.

The reasonableness of Meridian's reliance on the confidentiality and non-disclosure provisions of the SPA under the circumstances is an issue for the finder of fact, and plaintiff has provided enough factual matter to state a plausible claim, so defendant's argument must "fail at the pleading stage," just as a similar argument failed in *American Center for Excellence in Surgical Assisting Inc. v. Community College District 502*, 190 F. Supp. 3d 812, 822 (N.D. Ill. 2016). In that case, not only did the plaintiff require the defendant to sign a non-disclosure statement before it disclosed confidential information, but additionally, the broader circumstances suggested that the plaintiff took reasonable measures to maintain the secrecy of its information because the defendant "repeatedly had to request information from" the plaintiff. *Id.* The court reasoned that, if a "potential competitor interested enough in the program to invest considerable time and money in replicating it could not obtain the information other than from [plaintiff] directly," and the plaintiff only provided such information after entering into an agreement imposing confidentiality and nondisclosure obligations on the other party, that "suggests that [the] precautions were reasonable." *Id.* The court considered the plaintiff to have "plausibly allege[d] that [it] took reasonable measures to protect its trade secrets." *Id.*

The Court finds *American Center for Excellence in Surgical Assisting* instructive. As in that case, plaintiff has alleged that, at great cost, it developed proprietary information that a would-be competitor (defendant) could only obtain from plaintiff, and that plaintiff would only disclose, under cover of a confidentiality and nondisclosure agreement. That may not be enough to conclusively establish reasonable protective measures by itself—it wasn't in *American Center for Excellence in Surgical Assisting*, as it turned out[4]—but it is enough to survive a motion to dismiss.

---

[4] In *American Center for Excellence in Surgical Assisting*, the court ultimately granted summary judgment for defendant on the reasonable precaution issue, ruling that no reasonable juror could find that the plaintiff had taken reasonable protective measures based on the undisputed facts. 315 F. Supp. 3d 1044, 1058 (N.D.

*See id.* Plaintiff has plausibly alleged that it took reasonable efforts to maintain the confidentiality of its trade secrets.

## CONCLUSION

Defendant's motion to dismiss [75] is denied.

SO ORDERED.                                    ENTERED:   May 13, 2020

                                    _____
                                    **HON. JORGE ALONSO**
                                    **United States District Judge**

---

Ill. 2018).  But at the pleading stage, the court has only allegations before it, not evidence, and plaintiff need do no more than state a claim.